UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JAMES JOSEPH MARTIN, SR., ) | CASE NO. 5:16CV674 |
| ) | |
| Plaintiff, ) | JUDGE PATRICIA A. GAUGHAN |
| ) | |
| v. ) | Magistrate Judge George J. Limbert |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| ACTING COMMISSIONER OF SOCIAL ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, ) | OF MAGISTRATE JUDGE |
| ) | |
| Defendant. ) | |

Plaintiff James Joseph Martin, Sr. ("Plaintiff"), requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his application for disability insurance benefits ("DIB"). ECF Dkt. #1. In his brief on the merits, filed on July 5, 2016, Plaintiff asserts that the administrative law judge ("ALJ"): (1) failed to state valid reasons for rejecting the opinions issued by Plaintiff's treating physician; (2) did not properly evaluate Plaintiff's credibility; and (3) did not meet her burden at step five of the sequential evaluation. ECF Dkt. #13. On September 20, 2016, Defendant filed a response brief. ECF Dkt. #16. Plaintiff filed a reply brief on September 29, 2016. ECF Dkt. #17.

For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

## I. FACTUAL AND PROCEDURAL HISTORY

On April 10, 2013, Plaintiff protectively filed an application for DIB alleging disability beginning March 25, 2013. ECF Dkt. #11 ("Tr.") at 215-16.[2] Plaintiff's application was denied

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2] All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than the page numbers assigned when the Transcript was compiled. This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

initially and upon reconsideration. *Id.* at 167, 174. Following the denial of his application, Plaintiff requested an administrative hearing, and, on April 9, 2015, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id.* at 106-41, 180. On April 15, 2015, the ALJ issued a decision denying Plaintiff's application for DIB. *Id*. at 77. Plaintiff appealed, and on January 28, 2016, the Appeals Council denied review. *Id.* at 6.

On March 18, 2016, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. Plaintiff filed a brief on the merits on July 5, 2016. ECF Dkt. #13. On September 20, 2016, Defendant filed a response brief. ECK Dkt. #16. Plaintiff filed a reply brief on September 29, 2016. ECF Dkt. #17.

## II. RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A. Medical Evidence

On March 25, 2013, the alleged onset date, Plaintiff was hospitalized for a myocardial infection. Tr. at 327. Plaintiff was diagnosed by Kevin Silver, M.D., with coronary artery disease, hyperlipidemia, left ventricular ejection fraction of fifty-five percent, a history of tobacco use, and anxiety/stress. *Id.* at 396. On May 16, 2013, it was noted that Plaintiff was doing well and was referred for cardiac rehabilitation and an exercise tolerance test. *Id.* at 394. During a stress test on May 30, 2013, Plaintiff exhibited good exercise capacity. *Id.* at 399. In July 2013, Plaintiff indicated that he "felt okay," but that every other day his left arm became achy for a couple of hours with numbness and tingling. *Id.* at 391. In June 2013, a computerized tomography scan of Plaintiff's abdomen/pelvis revealed a mass on Plaintiff's left kidney, which led to the removal of that kidney on November 8, 2013. Tr. at 373, 477. An electrocardiogram ("EKG") study of Plaintiff's heart performed in July 2013 was within normal limits. *Id.* at 400.

Plaintiff underwent a psychological evaluation in July 2013, and was diagnosed with adjustment disorder with mixed anxiety and chronic depressed mood in partial remission with

medication, and alcohol abuse in reported partial remission.[3] Tr. at 405. On September 19, 2013, Dr. Silver stated that Plaintiff was doing well clinically following treatment for his cardiac problems, and noted that Plaintiff's kidney needed to be removed. *Id.* at 408-09. Dr. Silver also indicated that Plaintiff was exercising in cardiac rehabilitation, and had no chest pain, dyspnea, edema, or orthopnea. *Id.* at 408. State agency physicians reviewed the medical records in September 2013 and November 2013, and both found that Plaintiff could perform medium work with the additional limitations of frequently climbing ramps and stairs, and occasionally climbing ladders, ropes, and scaffolds. *Id.* at 149-50, 161-62.

On January 23, 2014, it was noted that Plaintiff was cancer free following the removal of his left kidney in November 2013. *Id.* at 463. Also in January 2014, Plaintiff's primary care physician, Regina Dorman, M.D., opined that Plaintiff could lift and/or carry less than ten pounds for one-quarter of an eight-hour workday, stand/walk for one hour without interruption in one eight-hour workday, and sit for one hour without interruption in an eight-hour workday. *Id.* at 446. Dr. Dorman also indicated that Plaintiff would miss more than four days per month, be off-task over twenty percent of the day, would need to lie down two or more hours per day, was limited to using his hands ten percent of the day, and would need more than four unscheduled breaks per day. *Id.* at 447.

Plaintiff underwent additional stress testing in April 2014 and July 2014. Tr. at 448, 508. The April 2014 testing produced the following findings: normal myocardial perfusion images; no infarction; no ischemia; normal post-pharmacologic stress left ventricular function; no focal wall abnormalities; normal hemodynamics; no ischemic EKG changes; and no symptoms during pharmacologic stress. *Id.* at 448-49. Likewise, the July 2014 testing again produced largely normal results, and it was noted that Plaintiff was doing well clinically. *Id.* at 508-09. Additionally, a renal ultrasound taken in May 2014 showed that the status of Plaintiff's right kidney was normal. *Id.* at 506.

---

[3]Plaintiff does not take issue with the ALJ's findings with respect to his mental impairments and limitations. *See* ECF Dkt. #13.

On November 19, 2014, Dr. Dorman examined Plaintiff for his complaints of lower back pain on both sides that radiated into his legs, and joint pains in his hands and feet. *Id.* at 511. Upon examination, Dr. Dorman made the following observations: normal curvature of Plaintiff's spine; no vertebral spine tenderness; paraspinal spasm; no tenderness in the sacroiliac joints; full range of motion in the extremities; and normal sensation, reflexes and gait. *Id.* at 513. Additionally, following an examination of Plaintiff's cervical spine, Dr. Dorman found no acute abnormality, mild degenerative disc disease, and mild bilateral degenerative osseous neural foraminal narrowing at C5-C6. *Id.* at 521. An examination of Plaintiff's lumbosacral spine revealed mild loss of disc height at L5-S1 with mild arthrosis at the same level, and sclerosis involving the inferior aspect of the right sacroiliac joint. *Id.* at 522. Radiology scans of Plaintiff's spine revealed mild degenerative disc disease in his lumbar and cervical spine. *Id.* at 551-52. On November 25, 2014, Plaintiff complained of chest pain and tachycardia, and an EKG performed at the time revealed an ejection fraction of sixty-five percent. *Id.* at 587-89.

In January 2015, Dr. Dorman ordered a cardiology event recorder, which indicated that there were no symptoms and no instances of arrhythmia during the thirty-day test. Tr. at 554. In February 2015, Plaintiff visited a different physician and was diagnosed with myocardial infarction, coronary artery disease, palpatations, chest pain (unspecified), a personal history of tobacco use, pica status post stent, and hyperlipidemia. *Id.* at 581. It was noted that Plaintiff did not have complaints of chest pain, dyspnea, edema, palpatations, or syncope. *Id.*

In March 2015, Dr. Dorman assessed Plaintiff to have anxiety, fibromyalgia, osteoarthritis, and hearing impairment. Tr. at 629. Dr. Dorman also referred Plaintiff to another physician, who assessed Plaintiff with chronic lower back pain, degenerative disc disease, obesity, chronic pain syndrome, and myalgia, and recommended medication, physical therapy, and the use of a transcutaneous electrical nerve stimulation unit. *Id.* at 616. Also in March 2015, Dr. Dorman issued an opinion indicating that Plaintiff could lift and carry no more than five pounds, stand or walk for a total of six hours, but zero hours uninterrupted, and sit for four hours total, but zero hours uninterrupted. *Id.* at 571. Continuing, Dr. Dorman opined that Plaintiff could occasionally climb, balance, stoop, crouch, kneel, and crawl, and could tolerate heights, moving machinery, temperature

extremes, chemicals, dust, fumes, and vibration. *Id.* Dr. Dorman noted that Plaintiff would be absent more than four days per month, off task more than twenty percent of the day, and would need to lie down for two or more hours during an eight-hour workday. *Id.* at 572. Additionally, Dr. Dorman found that Plaintiff could use his hands for only seventy percent of the workday and would require two unscheduled breaks during the day when performing even a sedentary job. *Id.*

Dr. Dorman also completed a medical source assessment of Plaintiff's mental abilities in March 2013. Tr. at 575-80. According to Dr. Dorman, Plaintiff had difficulties: remembering locations and work-like procedures; understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods of time; making simple work-related decisions; interacting appropriately with the general public; getting along with coworkers; maintaining socially appropriate behavior; being aware of normal hazards; setting realistic goals; and responding appropriately with changes in the work setting.[4]

### B. Testimonial Evidence

Per Plaintiff's request, an administrative hearing was held on April 9, 2015, during which Plaintiff provided testimony as to his allegedly disabling impairments. Tr. at 106. Prior to Plaintiff's examination, the ALJ explained the requirements to be found disabled under the Social Security Act and the manner in which the hearing would proceed. *Id.* at 109-10.

Upon examination by the ALJ, Plaintiff testified that he last worked in February 2014 and April 2014 in sales for a roofing construction company, but that he left the position because he was not earning money as he was not good with people and thus not making sales. Tr. at 113. Continuing, Plaintiff testified that, prior to his sales job, he performed home remodeling services with the assistance of his son. *Id.* at 113-15. Plaintiff stated that he stopped remodeling homes due to back pain, neck pain, general achiness throughout his body, and his recovery from kidney cancer. *Id.* at 115.

Upon questioning, Plaintiff testified that he believed that he was unable to perform full-time work because of back pain, anxiety, and depression. *Id.* at 118. Plaintiff rated his pain as eight on

---

[4]*See* n. 3, *supra.*

a scale of one to ten, stated that his pain on a typical day was usually between six and eight, and indicated that the pain was constant. *Id.* at 117-18. Continuing, Plaintiff testified that he suffered from arthritis in his joints and elbows, and that his back hurt if he sat too long. *Id.* at 118. Plaintiff testified that his symptoms were remaining the same rather than becoming better or worsening, and that he was unable to sleep through the night due to visiting the bathroom four to five times a night. *Id.* at 118-19. Regarding his anxiety, Plaintiff stated that he sometimes became overwhelmed, and would become nervous and begin sweating and shaking. *Id.* at 119. Plaintiff testified that during one such anxiety attack he was taken to an emergency room by an ambulance because he believed that he was having a heart attack. *Id.* According to Plaintiff, these types of anxiety attacks have occurred "a couple of times." *Id.*

Plaintiff's attorney then asked him to describe his typical daily activities. Tr. at 120. Plaintiff testified that he awoke between 8:00 A.M. and 9:00 A.M., and then watched television. *Id*. Continuing, Plaintiff stated that he might have brunch or lunch, and would then assist his wife with washing dishes, doing laundry, and cleaning the house. *Id.* Plaintiff indicated that he went to bed between 10:00 P.M. and 11:00 P.M., but could not sleep the whole night through since having his kidney removed. *Id.* According to Plaintiff, his son performed the yard work at his home. Plaintiff testified that he did not use a computer and that he had not "really visited any friends," but that he did visit his mother and father. *Id.* at 121. Plaintiff stated that he visited with his grandson.

Next, Plaintiff indicated that he had a dog, but did not need to walk the dog because his backyard was enclosed with a fence. Tr. at 122. As for exercise, Plaintiff testified that he was "in cardio rehab," but had to quit due to his kidney cancer, and that he had been doing yard work prior to his heart attack. *Id.* Plaintiff stated that he no longer went fishing due to his health. *Id.* at 123. Continuing, Plaintiff indicated that walking caused his back to hurt and his knees and legs to become fatigued. *Id.* Plaintiff testified that he thought the heaviest object he could lift was "probably about five or ten pounds [...] [a] grocery bag," and that he could not lift a bag of dog food. *Id.* When asked whether he had problems standing for a period of time, Plaintiff stated that he could probably stand for fifteen to twenty minutes before his back began hurting and he had to sit down, and that when he sat down he could only remain seated for thirty minutes before having to stand back up and

move around. *Id.* at 124. Plaintiff testified that he was able to reach overhead, and stated that he had arthritis in his hands and had problems holding objects. *Id.* at 124-25. Plaintiff indicated that he did not have any problems with his wrists except for what he described as "almost like an electric shock feeling, clicking" when he rotated his wrists. *Id.* at 125. According to Plaintiff, his feet swelled and hurt, but not as bad as his hands. *Id.*

The ALJ then asked Plaintiff about his March 2014 charge for driving under the influence. Tr. at 125. Plaintiff testified that his wife got her car stuck in the snow in his driveway and he went outside to help. *Id.* According to Plaintiff, a police officer saw the car halfway stuck in the road and smelled the alcohol when he approached. *Id.* at 125-26. Plaintiff testified that the officer then asked him if he had been drinking, to which Plaintiff responded in the affirmative, resulting in the charge. *Id.* at 126. Upon questioning by the ALJ, Plaintiff stated that he also had a driving under the influence charge from twenty years prior, as well as a domestic violence charge that was not related to alcohol. *Id.*

Next, Plaintiff testified that he had problems focusing and had a hard time understanding what he read when he read it for the first time. Tr. at 126-27. Plaintiff stated that he was usually able to stay on task, but was not able to deal well with change. *Id.* at 127. Continuing, Plaintiff testified that he: went to the grocery store; was able to cook for himself; was capable of paying bills with his wife; bathed himself; did not belong to any clubs or organizations; had not gone camping in three or four years because of how he felt and his financial situation; did not have problems with authority figures; was not good with crowds; and was "okay" with strangers. *Id.* at 127-29. Plaintiff stated that he was not receiving or practicing any non-medical treatment for his back, such as massages, other than hot showers. *Id.* at 129.

When asked about side effects from his medications, Plaintiff testified that he experienced muscle aches and "feeling like [he] got run over by a truck," and indicated that it felt like he had the flu. Tr. at 130. Plaintiff testified that he did not drink alcohol, that he was not in treatment for alcohol addiction, and that he had not drank alcohol since the March 2014 driving under the influence charge. *Id.* at 130-31. Additionally, Plaintiff testified that he did not smoke and did not use recreational drugs. *Id.* at 131.

Plaintiff was then questioned by his attorney. Tr. at 131. When asked whether he used the computer, Plaintiff indicated that he used it occasionally and that he probably would not be able to use the computer for a whole day due to pain in his hands. *Id.* at 131-32. Plaintiff testified that he experienced migraine headaches once or twice a week, and that he would suffer from residual headaches the rest of the day even after lying down to ease the initial severity of the migraine. *Id.* at 132. Continuing, Plaintiff testified that he had allergies and wore hearing aids in both ears. *Id.* at 133. Plaintiff stated that he experienced vertigo two to four times a week when he reached above his head. *Id.* at 134. When asked about his mental health, Plaintiff testified that he believed that his anxiety and depression resulted from his wife's sickness and the resulting surgeries. *Id.* at 134-35. Finally, Plaintiff testified that he did not think that he could perform the work he had done in the past. *Id.* at 135.

The ALJ then questioned a VE. Tr. at 136. The ALJ posed a hypothetical individual the same age as Plaintiff and with the same education and work experience, with the following limitations: occasionally lift more than fifty pounds; frequently lift and carry twenty-five pounds; stand or walk for about six hours; sit for six hours in an eight-hour workday with normal breaks; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolding; perform simple, routine, repetitive tasks, but not at a production rate pace, such as piecework or assembly line work; make simple work related decisions; frequent interaction with supervisors, coworkers, and the public; and off-task time that could be accommodated by normal breaks. *Id.* at 137. Based on the limitations dictated by the ALJ, the VE stated that the hypothetical individual could perform work as a hand packager, kitchen helper, and laundry worker. *Id.* at 137-38.

Next, the ALJ asked the VE whether there was available work for a hypothetical individual with the same limitations as the first hypothetical individual, but also requiring the option to alternate between sitting and standing. Tr. at 138. The VE testified that such an individual could perform jobs at the sedentary exertional level, such as final assembler, order clerk, and lab tester. *Id.* The ALJ also posed a third hypothetical individual with the same limitations as the second hypothetical individual, but also with the following added limitations: occasionally lift up to ten pounds; stand/walk for up to two hours; and sit for up to six hours in an eight-hour workday. *Id.*

The VE stated that such an individual could "do some of the sedentary unskilled jobs." *Id.* at 139. The ALJ then posed a fourth hypothetical individual with all the limitations of the third hypothetical individual, but who would also be on task only eighty percent of the workday. *Id.* The VE testified that there would be no jobs such an individual could perform that would be considered full-time competitive employment. *Id.*

Plaintiff's attorney then questioned the VE. Tr. at 139. The VE was asked if jobs would be available for an individual with the following limitations: lift twenty to fifty pounds no more than half a day; avoid heights, moving machinery; temperature extremes, dust, and vibration; occasionally climb, balance, stoop, crouch, kneel, and crawl; and frequent fine and gross manipulation. *Id.* at 139-40. According to the VE, there would be no competitive employment for an individual with the above limitations. *Id.* at 140. Following the questioning of the VE by Plaintiff's attorney, the ALJ concluded the hearing. *Id.* at 140-41.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.    LAW AND ANALYSIS

### A.    Treating Physician Rule

Plaintiff first argues that the ALJ failed to state valid reasons for rejecting the opinion of Plaintiff's treating physician, Dr. Dorman. ECF Dkt. #13 at 13. An ALJ must give controlling

-10-

weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so.  Social Security Rule ("SSR") 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.*  If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010).  The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ).  However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence.  *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir.

2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

Plaintiff takes issue with the fact that the ALJ afforded only partial weight to the opinions issued by Dr. Dorman. ECF Dkt. #13 at 14. First, Plaintiff argues that the ALJ found that fibromyalgia was a severe impairment, but then went on to find that fibromyalgia was a non-medically determinable impairment. *Id.* at 15. Plaintiff asserts that the ALJ failed to consider the criteria enumerated in SSR 12-2p. *Id.* Continuing, Plaintiff avers that the ALJ's finding that Dr. Dorman's March 2015 opinion contained "significant deviations" from her January 2014 opinion failed to take into account that the opinions were separated by approximately fourteen months and that an individual's health would not remain stagnant during that period of time.[5] *Id.* at 16. Plaintiff then states that the VE testified that an individual with limitations consistent with Dr. Dorman's less restrictive opinion would be unable find competitive unskilled light or medium employment. *Id.* Next, Plaintiff asserts that MRI examinations completed in May 2015, approximately one month after the ALJ's decision, provide support for Plaintiff's subjective complaints, and that the short period between the ALJ's decision and the MRI examinations supports Plaintiff's contention that the examination results should be considered as supplementing the record, rather than new evidence. *Id.*

Defendant contends that the ALJ provided sound reasons for finding that Dr. Dorman's opinions were only entitled to partial weight. ECF Dkt. #16 at 10. Namely, Defendant states that the ALJ explained that the lifting and carrying limitations included in Dr. Dorman's January 2014 opinion were inconsistent with her mild examination findings and the remaining evidence of record, and that the record showed that Plaintiff had full lumbar and cervical range of motion, as well as full extremity strength. *Id.* Defendant indicates that the ALJ found Dr. Dorman's January 2014 opinion and March 2015 opinion inconsistent, particularly due to the increased lifting, carrying, and manipulative abilities opined in the March 2015 opinion. *Id.* Continuing, Defendant asserts that the

---

[5]Plaintiff does not argue that the ALJ erred in discounting Dr. Dorman's March 2015 opinion regarding his mental health. *See* ECF Dkt. #13 at 13-16.

-12-

ALJ explained that the medical record, as a whole, was inconsistent with the March 2015 opinion. *Id.* Defendant states that the ALJ pointed to evidence showing that Plaintiff had full range of motion in his lumbar and cervical spine along with full extremity strength, and that the ALJ also noted that Plaintiff had normal sensation and reflexes, and a normal gait with independent ambulation. *Id.* at 10-11.

Next, Defendant avers that the MRI studies completed in May 2015 should not be considered in determining whether substantial evidence supports the ALJ's decision because the Sixth Circuit recognizes that "where the Appeals Council considers new evidence but declines to review a claimant's application for [DIB] on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." ECF Dkt. #16 at 12 (quoting *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996)). Defendant also asserts that Plaintiff's argument that the ALJ should have given greater weight to Dr. Dorman's opinions because they were issued after Plaintiff's kidney was removed should not be accepted because Plaintiff has failed to show that the removal of his kidney would further support Dr. Dorman's opinion.[6] *Id.*

Plaintiff's arguments fail. First, the entirety of Plaintiff's argument that the ALJ made inconsistent statements regarding his fibromyalgia consists of the following:

> In her decision, the ALJ stated at finding number 3 that fibromyalgia was a severe impairment. The ALJ then further found that fibromyalgia was a non-medically determinable impairment. The ALJ failed to consider all the criteria enumerated in [SSR] 12-2p. These statements are inherently inconsistent and should be resolved prior to a finding that [Plaintiff] was not disabled.

ECF Dkt. #13 at 15 (internal citations omitted). While the ALJ's statements may be inconsistent, any inconsistency set forth by the ALJ is harmless because the ALJ explained why he determined that fibromyalgia was not a medically determinable impairment. The ALJ stated the following:

---

[6]Plaintiff poses this argument in the portion of his brief regarding his credibility, rather than the portion in which he argues that the ALJ violated the treating physician rule. *See* ECF Dkt. #13 at 19-20.

-13-

> In this case, a medical history of fibromyalgia has been noted (Exhibit 25). However, there is no objective medical evidence establishing that [Plaintiff] suffers from fibromyalgia, as physical examinations have failed to reveal positive tender points as set forth in SSR 12-2p to establish fibromyalgia as a medically determinable impairment (Exhibit 1F, 2F, 3F, 4F, 8F, 9F, 10F, 11F, 12F, 13F, 14F, 15F, 18F, 19F, 20F, 23F, 24F, 25F). In addition, the record lacks evidence of a recent diagnosis of said condition by one of [Plaintiff's] treating providers (*Id.*). As a result, I find fibromyalgia to be a non-medically determinable impairment, and as such, will not consider said condition when assessing [Plaintiff's] [RFC].

Tr. at 83.

The ALJ explained that there was no objective medical evidence of fibromyalgia in the record, and therefore she would not consider fibromyalgia when making a RFC finding. Moreover, Plaintiff's assertion that the ALJ failed to consider the criteria enumerated in SSR 12-2p is made without any indication whatsoever as to how he believes the criteria can be met or what medical evidence he would rely upon in making such a showing. In fact, the lack of objective medical evidence showing that Plaintiff suffered from fibromyalgia would make it impossible for Plaintiff to demonstrate that his alleged fibromyalgia was a medically determinable impairment. *See* SSR 12-2p.[7] Any inconsistency that may exist in the ALJ's findings regarding Plaintiff's fibromyalgia is harmless as the ALJ gave good reasons for her treatment of Plaintiff's fibromyalgia and Plaintiff has failed to provide any medical evidence that contradicts that treatment.

Plaintiff's argument regarding the partial weight afforded to Dr. Dorman's January 2015 and March 2015 opinions essentially criticizes the ALJ for not stating in the decision that the two opinions were fourteen months apart when finding "significant deviations" in the later opinion. *See* ECF Dkt. #13. Plaintiff does not attempt to explain the deviations, instead stating, "[t]he ALJ failed to consider the fact that a persons health would not stay stagnant." *Id.* No explanation is provided as to why it was not possible that Plaintiff's health would remain stagnant for just over a year. *See*

---

[7]SSR 12-2p(III)(A)(1) reads, in part:

> As in all claims for disability benefits, we need objective medical evidence to establish the presence of a [medically determinable impairment]. When a person alleges [fibromyalgia], longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment.

*id.* In fact, Plaintiff's own testimony given just over a month after Dr. Dorman's March 2015 opinion indicated that his condition remained consistent. Plaintiff testified:

> [Upon questioning by the ALJ]
>
> Q: Would you say your symptoms overall, are they improving, staying the same or getting, getting worse?
>
> A: They are the same.

Tr. at 118. Plaintiff's assertion that "a persons health would not stay stagnant" for fourteen months is not supported by any citation to medical evidence or medical authority, and is contradicted by Plaintiff's own testimony.

More importantly, Plaintiff fails to address the substantive reasons the ALJ provided for affording Dr. Dorman's opinion's partial weight. As for the January 2014 opinion, the ALJ indicated that the lifting and carrying limitations imposed restrictions that were inconsistent with Dr. Dorman's mild examination findings and the remaining evidence of record, which confirmed full lumbar and cervical range of motion, as well as full extremity strength. Tr. at 96. The ALJ also stated that the March 2015 opinion was inconsistent with the medical record as a whole, which included evidence of full lumbar and cervical range of motion, full extremity strength, normal sensation and reflexes, and a normal gait with independent ambulation. *Id.* Based on these inconsistencies, that ALJ determined that the severe standing, walking, sitting, postural, and environmental limitations imposed in the March 2015 opinion were not warranted. *Id.* Plaintiff has failed to explain, or even argue, how the ALJ's substantive reasons for affording Dr. Dorman's opinions less than controlling weight were not valid.

As for Plaintiff claims that Dr. Dorman's opinion were issued after Plaintiff's kidney was removed and are thus more probative than the state agency physicians, the claim fails because the ALJ stated valid reasons for discounting the weight afforded to Dr. Dorman's opinions due to inconsistencies between the opinions and examination findings. Plaintiff has failed to show, or argue, that the ALJ erred in the weight afforded to the opinions issued by the state agency physicians. Likewise, Plaintiff has failed to demonstrate that the ALJ erred in the weight she afforded Dr. Dorman's opinions. Additionally, Plaintiff's contention that the VE testified that

-15-

Plaintiff would not be able to find competitive unskilled light or medium employment based on Dr. Dorman's less restrictive opinion is premised on the assumption that the ALJ was required to afford that opinion controlling weight.  As discussed above, the ALJ provided valid reasons for affording Dr. Dorman's opinions less than controlling weight. Continuing, the MRI studies completed in May 2015, after the ALJ issued a decision in April 2015, have no bearing on this Court's review in the instant case.  The Appeals Council considered the May 2015 MRI studies, and then declined to review Plaintiff's application for DIB on the merits.  Tr. at 6-7; *see Cline*, 96 F.3d at 148.  Further, the ALJ informed Plaintiff of the proper action to take if he believed that the May 2015 MRI studies demonstrated disability.  Tr. at 7.  For the foregoing reasons, Plaintiff has failed to show that the ALJ did not state valid reasons for affording the opinions of his treating physician less than controlling weight.

### **B.**     **Credibility**

Plaintiff next argues that the ALJ did not properly evaluate Plaintiff's credibility because the ALJ's findings: (1) were contrary to the May 2015 MRI studies; (2) were contrary to Dr. Dorman's opinions; and (3) ignored Plaintiff's kidney cancer.  ECF Dkt. #13 at 19-20.  Defendant contends that: (1) the May 2015 MRI studies should not be considered because the studies were not before the ALJ; (2) the ALJ provided good reasons for giving Dr. Dorman's opinion only partial weight; and (3) the ALJ specifically noted that Plaintiff reported a history of kidney cancer.  ECF Dkt. #16 at 13-14.  Expanding on the contention that the ALJ considered Plaintiff's kidney cancer, Defendant indicates that the ALJ listed Plaintiff's renal issues as a severe impairment.  *Id.* at 14.

As for Plaintiff's first two arguments, and as discussed above, the undersigned agrees with Defendant that the May 2015 MRI studies should not be considered for the purposes of this review and that the ALJ provided valid reasons for affording only partial weight to Dr. Dorman's opinions. Additionally, Defendant is correct in asserting that the ALJ did not ignore Plaintiff's kidney cancer. The ALJ listed renal issues as a severe impairment, recognized Plaintiff's kidney cancer, and provided a summary of the treatment Plaintiff received from May 2013, the onset of medical treatment surrounding Plaintiff's kidney cancer, through follow-up appointments after the removal of the kidney running into 2014.  Tr. at 77, 81, 86.

-16-

Finally, Plaintiff asserts that "the ALJ herself stated that she did pick and choose the evidence which would support her conclusion." ECF Dkt. #13 at 20. Plaintiff does not indicate where in the ALJ's decision she expressly states that she chose to consider evidence that would support a determination that Plaintiff was not disabled while ignoring evidence that Plaintiff was disabled, or provide any further explanation as to how the ALJ erred in this regard. In fact, the ALJ's statements contradict Plaintiff's claim that the ALJ did not consider all of the evidence. For example, when concluding her discussion of Plaintiff's RFC, the ALJ stated:

> In sum, the record as a whole, including the overall evidence of record, the medical evidence, [Plaintiff's] testimony, [Plaintiff's] activities, and other factors described above support some functional limitations. However, they do not fully support the credibility of [Plaintiff] regarding the severity or frequency of symptoms as more supportive of any greater limitations or restrictions than those included in the [RFC] as set forth in this decision. Based upon all these factors, I have determined that the record as a whole does not fully support [Plaintiff's] subjective allegations about the disabling nature of the impairments to the extent they are inconsistent with the above-described [RFC]. Consequently, there is no basis for finding that [Plaintiff] has suffered debilitating symptoms that would further reduce the [RFC] described above at any time through the date of this decision.

Tr. at 98. A reading of the ALJ's decision support her summary explaining that she considered the record as a whole. The ALJ issued a detailed opinion explaining Plaintiff's medical history and opinions regarding Plaintiff's limitations. Plaintiff has failed to provide any support for his assertion that the ALJ was selective when reviewing this case, and a review of the ALJ's decision reveals that the ALJ did not pick and choose evidence when making her determination. *See* Tr. at 80-100. For these reasons, Plaintiff has failed to show that the ALJ erred when making a determination as to Plaintiff's credibility.

### C. Step Five

Additionally, Plaintiff claims that the ALJ did not meet her burden at step five of the sequential evaluation. ECF Dkt. #13 at 20. After reciting Sixth Circuit precedent explaining that prejudice arises when the Social Security Administration does not follow its own rules and regulations, the entirety of Plaintiff's argument consists of the following:

-17-

> In this case, the ALJ did not comply with the regulations in that she did not properly evaluate the cumulative effects of [Plaintiff's] impairments, including the fact that his hands swell, when she found that he could perform work at the medium level of exertion. When the [VE] was asked to consider whether a person limited to medium work, but only able to use their hands frequently for both gross and fine manipulation, it was opined that there would be no competitive employment. [sic]

*Id.* at 21. Plaintiff cites no medical evidence indicating that the swelling of his hands would prevent him from performing jobs requiring frequent gross and fine manipulation, instead citing only to the hearing testimony provided by the VE in response to questions posed by Plaintiff's attorney. *Id.* (citing Tr. at 140). As discussed above, Plaintiff has failed to demonstrate that the ALJ's RFC determination was flawed. The hypothetical questions relied upon by the ALJ reflect a valid finding regarding Plaintiff's RFC. Plaintiff has failed to cite any objective medical evidence contrary to the limitations imposed in the hypothetical questions asked by the ALJ at the hearing. As such, Plaintiff has failed to establish any reason why the Court should determine that the ALJ did not meet her burden at step five of the sequential evaluation.

## **VI.    CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.


Date: October 21, 2016            */s/George J. Limbert*
                                  GEORGE J. LIMBERT
                                  UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).